# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

RUFUS WEST,

                        **Plaintiff,**


            -vs-                                    **Case No.    03-C-0658**


**CHAPLAIN TODD OVERBO,**
**GERALD BERGE, BRADLEY HOMPE,**
**SANDRA GRONDIN, DENNIS WEEDEN,**
**LINDA HODDY-TRIPP, MICHAEL SNODGRASS,**
**CHAD LOMEN, SHARON PETERSON,**
**KEITH WEIGEL, GARY WETTER,**
**STEVEN CLEVEN, MATTHEW SCULLIO,**
**PHILLIP HENNEMAN, ROBERT SHANNON,**
**RICKIE GOVIER, CHRISTA McCORMICK,**
**MATTHEW J. FRANK, JON LITSCHER,**
**CINDY O'DONNELL, JEFFREY ENDICOTT,**
**DANIEL BERTRAND, TIME DOUMA,**
**DEAN FABRY, LESTER NEUMAN, and**
**JOHN and JANE DOE,**

                        **Defendants.**


_____

## DECISION AND ORDER
_____

                The plaintiff, Rufus West, who is currently incarcerated at the Wisconsin

Secure Program Facility, filed this _pro se_ civil rights action pursuant to 42 U.S.C. § 1983

and was granted leave to proceed _in forma pauperis_ on December 16, 2003.  The plaintiff

alleges that the defendants violated his rights under the First Amendment free exercise

and establishment clauses, and the equal protection and due process clauses of the Fourteenth Amendment. The defendants have filed a motion for summary judgment which will be addressed herein.

## I. FACTUAL BACKGROUND

On July 11, 2003, the plaintiff lodged his civil rights complaint against Chaplain Todd Overbo, Matthew Frank, Jon E. Litscher, Cindy O'Donnell, Warden Jeffrey P. Endicott, Warden Daniel Bertrand, Warden Gerald A. Berge, Lt. Parker, Tim Douma, Laura Hallet, Unit Manager Hompe, John Sharpe, S. Gronden, D. Weeden, SG, TM, Linda Hoody, Sgt. Snotgrass, Officer Fabry, Officer Lomen, Officer Neuman, Officer Peterson, Officer Weigel, Officer Wetter, Officer Cleven, Officer Scullion, Officer Henneman, Officer Shannon, R. Govier, Officer McCormick, and John and Jane Doe. On December 16, 2003, John Sharpe was terminated as a defendant, and the plaintiff was permitted to proceed against the remaining defendants on claims concerning: 1) interference with his institutional mail, 2) access to reading materials, 3) destruction of his personal property, 4) denial of access to the courts, and 5) practice of the Muslim faith.

### A. Defendants' Motion

On October 29, 2004, the defendants filed a motion for summary pursuant to Federal Rule of Civil Procedure 56. In support of their motion, the defendants submit the affidavits of Sandra J. Grondin, Daniel R. Betrand, Glen C. Ripley, Amy M. Millard, Gerald A. Berge, Ellen K. Ray, Todd T. Overbo, Anthony Broadbent, Fred Kippley, Chad

-2-

Lomen, Sharon Peterson, Vicki Sebastian and Keith A. Wiegel. The defendants also submit Wisconsin Department of Corrections Inmate Complaint Review System (ICRS) grievance records in support of their motion.

A district court cannot properly rule upon a motion for summary judgment without providing the opposing party a "reasonable opportunity" to contradict the material facts asserted by the movant. *Lewis v. Faulkner*, 689 F.2d 100, 101 (7th Cir. 1982). This means that a *pro se* prisoner, who is a plaintiff in a civil case, is entitled to receive notice of the consequences of failing to respond to a motion for summary judgment or to a motion to dismiss supported by affidavits. *Id*.

In this case, counsel for the defendants provided the plaintiff with the required notice statement. The plaintiff was also provided with the text of the Federal Rules of Civil Procedure 56(c) and (f), as well as Civil Local Rules 7.1, 56.1 and 56.2 (E.D. Wis.). Accordingly, the court finds that the plaintiff has been given notice and a fair opportunity to present counter-affidavits or other evidence in opposition to the defendants' motion.

**B. Standard of Review**

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a

verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, *Anderson*, 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id.* at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 323-24. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record - only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

## C. Relevant Undisputed Facts[1]

Between April 1998, and September 2001, the plaintiff was transferred four times to three Wisconsin Department of Corrections (DOC) prisons. (Affidavit of Amy M. Millard [Millard Aff.] 10/22/04 at 2 ¶ 8; Affidavit of Glen C. Ripley 10/21/04 [Ripley Aff.] at 2 ¶ 8; Affidavit of John Ray [Ray Aff.] at 5 ¶ 24; Affidavit of Gerald A. Berge 10/2/04 [Berge Aff.] at 1 ¶ 1). The plaintiff was housed at Columbia Correctional Institution (CCI) in Portage, Wisconsin from April 10, 1998 to June 26, 1998. (Millard Aff. at 2 ¶ 8). On June 26, 1998, the plaintiff was moved to Green Bay Correctional Institution (GBCI). (Ripley Aff. at 2 ¶ 8). Next, the plaintiff was moved back to CCI on January 28, 1999. (Millard Aff. at 2 ¶ 8). On July 24, 2000, the plaintiff was returned to GBCI. (Ripley Aff. at 2 ¶ 8). Finally, on September 6, 2001, the plaintiff was relocated to the Wisconsin Secure Program Facility (WSPF) in Boscobel, Wisconsin, where he is currently housed. ( Ray Aff. at 5 ¶ 24). WSPF was formerly known as the Supermax Correctional Institution (SMCI). (Berge Aff. at 1 ¶ 1).

The plaintiff filed suit on July 11, 2003, alleging that his First and Fourteenth Amendment rights were violated at three different correctional institutions. (Complaint at 1). On December 16, 2003, the plaintiff was allowed to proceed on 42

---

[1]The relevant facts are based upon the defendants' affidavits to the extent they are undisputed and factual propositions submitted by the plaintiff in the verified complaint, and the plaintiff's Response to Defendants' Motion for Summary Judgment to the extent such factual propositions are undisputed. *See* Civ. L.R. 56.2 (E.D. Wis.).

claims against 27 defendants. (Screening Order dated 12/16/03). The plaintiff's claims
can be summarized as follows:[2]

### 1. Institutional Mail

In claims CCI-1999-31259, CCI-1995-46888, SMCI-2001-28348, and
claims 3, 4, 5, 8, and 15, the plaintiff alleges that the defendants illegally
read, confiscated and destroyed his mail.

### 2. Reading Materials

In claims 6, 9, 10, 11, 20, 21, 22, 23, 27 and 28, the plaintiff complains that
the defendants illegally confiscated and deprived him of his fliers, photos,
books, magazines, catalogs and newsletters.

### 3. Property

In claims 24, 25, 29, 31, 32, 33, 34 and 35, the plaintiff avers that the
defendants illegally seized, stole, misplaced and destroyed his magazines,
photos, mail and envelopes.

### 4. Access to the Courts

In claims 12, 13, 16, 17,1 8 and 19, the plaintiff submits that the defendants
illegally refused to send his legal mail, grant an extension of his legal loan,
provide him photocopies, and pay his partial filing fee out of his legal loan
account.

### 5. Religion

In claims 37, 38, 39, 40, 41 and 42, the plaintiff contends that the
defendants retaliated against him on the basis of his religion, and
discriminated against Muslim inmates by providing inferior Islamic
television and by failing to properly conduct the Ramadan feast of Eid-al-
Fitr.

---

[2] The court uses the claims numbering system provided by the defendants. The defendants have provided the
court with a summary of plaintiff's claims because many of his grievances were not assigned an ICRS number. *See* Brief
in Support of Defendants' Motion for Summary Judgment Claims Chart at 1-10. Federal Rule of Evidence 1006
specifically provides for the admission of such evidence. ("Summaries: The contents of voluminous writings, recordings,
or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or
calculation.").

The defendants include:

Wardens: Daniel Betrand is the Warden of GBCI, and he is responsible for the overall administration and operation of GBCI. (Affidavit Daniel R. Bertrand [Bertrand Aff. at 1 ¶¶ 1,2).  Gerald Berge is the warden of WSPF, and he is responsible for the overall administration and operation of WSPF, as well as implementing DOC policies. (Berge Aff. at 1-2 ¶¶ 1,5).

Institution Complaint Examiners (ICEs): Ellen Ray is the ICE at WSPF, and she investigates complaints filed by WSPF inmates, and performs other ICE duties as set forth in Wisconsin Administrative Code Chapter 310.  (Affidavit of Ellen Ray [E.Ray Aff] at 1 ¶¶ 1,2). Glen Ripley is an ICE at GBCI, and his duties include investigating complaints filed by inmates, and performing other duties set forth under Wisconsin Administrative Code Chapter 310.  (Ripley Aff at 1 ¶¶ 1,2). As a Corrections Unit Supervisor and acting ICE at CCI, Amy Millard is responsible for investigating complaints filed by inmates, and performing ICE duties as stated in Wisconsin Administrative Code Chapter 310.  (Millard Aff. at 1 ¶¶ 1,3).[3]

Correctional Officers: Sandra Grondin, Chad Lomen, Sharon Peterson and Keith Weigel are Correctional Officers at WSPF, and they are  responsible for the security and control of inmates, interpreting and applying institution regulations and procedures, and determining whether property received by inmates is acceptable under institution regulations.  (Affidavit of Sandra Grondin [Grondin Aff.] at  ¶¶ 1,2; Affidavit of Sharon

---

[3]  Ellen Ray and Glen Ripley are not named defendants.  However, they provide affidavits regarding the legislative history of Wisconsin Administrative Code Chapter DOC § 310 and inmate access to administrative complaint procedures.  Similarly, Amy Millard is not a named defendant, but her affidavit attests to the plaintiff's institutional transfer history.

Peterson [Peterson Aff.] at 1 ¶¶ 1,2; Affidavit of Chad Lomen [Lomen Aff.] at 1 ¶¶ 1,2; Affidavit of Keith Weigel [Weigel Aff.] at 1 ¶¶ 1,2).

Other: Vicki Sebastian is a Corrections Program Supervisor at WSPF, and her job duties include planning, coordinating, and administering specialized programs and support services. (Affidavit of Vicki Sebastian [Sebastian Aff at 1-2 ¶¶ 2,3). Anthony Broadbent is the Food Services Administrator at WSPF, and his duties include overseeing the operation of the entire WSPF food service program. (Affidavit of Anthony Broadbent [Broadbent Aff.] at 1 ¶¶ 1,2). Todd Overbo is the Chaplain at WSPF, and his duties include coordinating pastoral visits, making weekly cell-front rounds, filling requests for religious materials, and scheduling religious programming on the WSPF closed circuit television network. (Affidavit of Todd Overbo [Overbo Aff.] at 1 - 2 ¶¶ 1, 3). Fred Kippley is the proprietor of Locktight Security and Satellite, and was awarded the bid to provide satellite television to WSPF inmates. (Affidavit of Fred Kippley [Kippley Aff.] at 1 ¶¶ 1,2).

Wisconsin Administrative Code Chapter DOC § 310 (DOC 310) was revised during the plaintiff's incarceration at WSPF. (Ray Aff. at 2 ¶ 6). Prior to December 1, 2002, DOC 310 as set forth in Register April 1998 No. 508 effective May 1, 1998, was in effect. (Ray Aff. at 2 ¶ 6). However, on December 1, 2002, DOC 310 as set forth in Register November 2002 No. 563 became effective. (Ray Aff. at 2 ¶ 6).

The institution law libraries at CCI, GBCI and WSPF provide all inmates with access to the Inmate Complaint Review System (ICRS) complaint procedures under DOC 310. (Millard Aff. at 2 ¶ 6; Ripley Aff. at 2 ¶ 6; Ray Aff. at 2 ¶ 7). All GBCI and

WSPF inmates receive written notification and an oral explanation of the complaint procedures upon arrival at the institution. (Ripley Aff. at 2 ¶ 6). All WSPF inmates are provided with an opportunity to ask and have questions answered regarding the ICRS procedures. (Ray Aff. at 2 ¶ 7).

## II. DISCUSSION

**A. Exhaustion of Administrative Remedies**

The Prisoner Litigation Reform Act of 1995 (PLRA), Pub. L. 104-134, 110 Stat. 1321 (1996), provides that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997(e)a.

Exhaustion of administrative remedies is a condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002) (citing *Perez v. Wis. Dep't of Corrs.*, 182 F.3d 532, 535 (7th Cir. 1999)). Section 1997e applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

ICRS is the administrative remedy available to all Wisconsin inmates with complaints about prison conditions or the actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). The Wisconsin Administrative Code specifically provides that before an inmate may commence a civil action, the inmate shall exhaust all administrative remedies that the Department of Corrections has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is available for inmates to "raise significant issues regarding

rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code § DOC 310.08(1).

In order to use the ICRS, an inmate must file a complaint with the inmate complaint examiner with fourteen days after the occurrence giving rise to the complaint. Wis. Admin. Code §§ DOC 310.07(1) and 310.09(6). After reviewing and acknowledging each complaint in writing, the inmate complaint examiner either rejects the complaint or sends a recommendation to the "appropriate reviewing authority." Wis. Admin. Code §§ DOC 310.11(2) and 310.11(11). The appropriate reviewing authority makes a decision within ten days following receipt of recommendation. Wis. Admin. Code § DOC 310.12(1). Within ten days after the date of the decision, a complainant dissatisfied with a reviewing authority decision may appeal that decision by filing a written request for review with the corrections complaint examiner. Wis. Admin. Code § DOC 310.13(1). The corrections complaint examiner reviews the appeal and makes a recommendation to the Secretary of the Department of Corrections. Wis. Admin. Code § DOC 310.13(6). The Secretary may accept, adopt, or reject the correction complaint examiner's recommendation, or return the appeal to the corrections complaint examiner for further investigation. Wis. Admin. Code § DOC 310.14(2).

### 1. Claims 8, 9, 12, 13 and 27

The plaintiff alleges that he was prevented under Wisconsin Administrative Code § DOC 310.09(2) from filing inmate complaints for claims 8, 9, 12, 13 and 27, and he submits hand-printed copies of rejected complaints in support if his proposition.

(Plaintiff's Exhibits 15, 16, 18 and 19). The defendants contend that these documents are inadmissible because they are not properly authenticated.

Wis. Admin. Code § DOC 310.09(2) provides:

Inmates may not file more than 2 complaints per calendar week, except that the ICE may waive this limit for good cause. The ICE shall exclude complaints that raise health and personal safety issues from this limit.

*Id.*

The plaintiff did not allege health and safety issues in his complaints. Thus, they were properly rejected by the ICE. *Id.* To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require. *Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002).

The authenticity of the plaintiff's evidence is of no import because the plaintiff did not appeal his rejected complaints. That is, even if the plaintiff's evidence of his rejected complaints was admitted, he is still required to appeal the rejected complaints and exhaust his administrative remedies. Wis. Admin. Code DOC § 310. This he has not done.

The plaintiff contends that the two complaint per week limit as stated in Wisconsin Administrative Code DOC § 310.09(2) deprives him of available administrative remedies. He urges us to adopt *Dale v. Lappin*, 376 F.3d 562 (7th Cir. 2004), in which the Seventh Circuit held that prison officials may not block a prisoner's access to the ICRS and then assert that the prisoner failed to exhaust his administrative remedies. *Id. Dale*, however, is distinguishable because the petitioner in that case was denied access to prison forms. *Id.* Here, the plaintiff has not alleged that he was denied inmate complaint forms.

In addition, the plaintiff had an available administrative remedy when his complaints were rejected under DOC 310.09(2) because he had fourteen days after the event giving rise to the complaint to file a grievance. Wis. Admin. Code §§ DOC 310.07(1) and 310.09(6). If the plaintiff's complaint was rejected one week, he could timely re-file the next week, assuming he promptly filed the first time. *Id.* If the plaintiff's complaint was then dismissed because his own delay prevented him from re-filing a rejected complaint, the plaintiff cannot claim that he was deprived of available administrative remedies. See *Williams v. Briley*, 2005 U.S. Dist. LEXIS 12883 (7th Cir.2005) (Plaintiff cannot submit a complaint that he knows to be procedurally flawed, and then claim that defendants obstructed his attempt to follow the grievance procedure).

Next, the plaintiff asserts that prior to December 1, 2002, inmates did not have to appeal rejected complaints to the corrections complaint examiner (CCE) to exhaust administrative remedies. Under the "old" version of DOC 310, once an ICE received a complaint he could: 1) investigate; 2) reject; 3) dismiss; 4) attempt to resolve the complaint; or 5) recommend a decision to the appropriate reviewing authority. Wis. Admin. Code DOC § 310.06(2). Within 10 calendar days after the ICE's decision, a dissatisfied complainant could appeal by filing a written request for review with the CCE. DOC § 310.13(1). However, a CCE could *not* review a complaint rejected as frivolous under 310.11(4). Wis. Admin. Code DOC § 310.13(4)(emphasis added). Frivolous complaints could only be appealed to the appropriate reviewing authority. Wis. Admin. Code DOC § 310.11(4). Thus, under the old DOC 310, an inmate had to correctly choose

whether to appeal to the CCE or the appropriate reviewing authority to exhaust available administrative remedies.[4]

When the plaintiff's complaints were rejected as exceeding the two complaint per week limit, he had to appeal to the CCE to exhaust his available administrative remedies. Wis. Admin. Code DOC § 310.13(1). It is undisputed that the plaintiff did not do this. (Plaintiff's Response to Defendants' Proposed Findings of Fact at 1-2). Accordingly, these claims shall be dismissed.

### 2. Claims 5, 16, 20 and 24

The parties disagree about whether the plaintiff filed an inmate complaint for claim 5, but it is undisputed that the plaintiff submitted inmate complaints for claims 16, 20 and 24. (Defendants' Proposed Findings of Fact at ¶¶ 33-39, 101, and 107). The defendants charge that the plaintiff has not exhausted any of these claims.

The plaintiff maintains that the defendants "erred" in claiming that he failed to exhaust administrative remedies. (Plaintiff's Response to Defendants' Summary Judgment Motion at 1). However, he provides no evidence in support of his proposition. "It is well settled that conclusory allegations...without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002)(citing *Patterson Chi. Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998). As discussed above, the plaintiff had to appeal to the CCE to exhaust his administrative

---

[4]The new DOC § 310 requires an inmates to appeal *any* rejected complaint within 10 calendar days to the appropriate reviewing authority. Wis. Admin. Code DOC 310.11(6) (emphasis added). The appropriate reviewing authority shall only review the basis for the rejection of the complaint. *Id.* The CCE shall not review a rejected complaint. Wis. Admin. DOC 310.12(3).

remedies. Wis. Admin. Code § DOC 310.13(1). This he did not do. Accordingly, claims 5, 16, 20, and 24 shall be dismissed.

It is undisputed that claims 7, 10, 11, 14, 15, 17, 18, 21, 22, 23, 24, 25, 26, 37, 38, 41, and 42 are exhausted. (Brief in Support of Defendants' Motion for Summary Judgment Claims Chart at 1-10; Defendants' Reply to Plaintiff's Response to Defendants' Proposed Findings of Fact at ¶¶ 31 and 107). Therefore, the court will address the merits of these claims.

### III. DISCUSSION

**A. Legal Mail**

**1. Claim 7: WSPF's Mail Policy**

The plaintiff alleges that since September 6, 2001, defendants Berge, Litscher, O'Donnell and Frank violated his equal protection rights by mandating that all of his non-legal outgoing mail be submitted to prison officials unsealed. (Complaint at 3). The defendants contend that WSPF's mail policy is within the institution's discretion under DOC 309.04. (Berge Aff. at 2 ¶ 9).

The purpose of the equal protection clause of the Fourteenth Amendment is to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (citing *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923); *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 340, 352 (1918)). To comply with equal protection, governmental entities are generally required to treat all similarly-

situated persons in a similar manner. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "To state an equal protection claim, a § 1983 plaintiff must allege that a state actor purposefully discriminated against him because of his identification with a particular (presumably historically disadvantaged) group." *Sherwin Manor Nursing Center, Inc. v. McAuliffe*, 37 F.3d 1216, 1220 (7th Cir 1994).

Prisoners do not constitute a suspect class entitled to strict scrutiny of regulations or programs affecting them. *Pryor v. Brennan*, 914 F.2d 921, 923 (7th Cir. 1990). Where the circumstances do not involve a suspect classification such as race or gender, an inmate who challenges a particular prison practice or regulation must show or indicate that the regulation is not reasonably related to a legitimate governmental concern, or must demonstrate that the challenged regulation or practice is an exaggerated response to those concerns. See *Turner v. Safely*, 482 U.S. 78 (1987); *Caldwell v. Miller*, 790 F.2d 589 (7th Cir. 1986).

Wis. Admin. Code DOC §§ 309.04(4)(a) and (4)(b) provide:

Incoming and outgoing mail may be opened and inspected for contraband. It shall not be delivered it if contains contraband.

Correctional staff may read mail other than mail specified in sub (3) [legal mail] in order to ensure the safety of the institution, institution staff, inmates and the general public.

*Id.*

The plaintiff fails to show that WSPFs' policy is not reasonably related to a legitimate governmental concern. The policy acts as a filter for illegal contraband and dangerous gang activities, and it provides inmates with corrective behavior so they may safely integrate back into the DOC system. (Berge Aff. at 2, 4-5 ¶ 21). Courts have

recognized these to be legitimate penological interests. *Procunier v. Martinez*, 416 U.S 396, 404 (1974). Furthermore, the orderly operation of prisons has generally been committed to prison officials, not the federal court. See *Bell v. Wolfish*, 441 U.S. 520 (1979); *see also Woods v. O'Leary*, 890 F.2d 883 (7th Cir. 1989). Such matters are within the peculiar expertise of corrections officials and, therefore, the courts will generally accord great deference to their expert judgment, unless there is substantial evidence to argue against it. *Id.* There is not such evidence before the court today. Accordingly, this claim shall be dismissed.

### 2. Claims 14 and 15: Legal Mail and Post-It Notes

The plaintiff alleges that defendant Peterson removed and destroyed a note from the Clerk of Court in Milwaukee because it was a pink post-it, and that defendants Gronden and John Doe opened and stuck a yellow Post-It note on his legal mail, which defendant Weigel destroyed at mail call. (Complaint at ¶¶ 38, 39). The defendants contend that WSPF's ban against Post-It notes is reasonably related to legitimate penological interests, (Weigel Aff. At 2, 3 ¶ 10-11; Peterson Aff. at 2 ¶9, and 3 ¶ 10), and that the plaintiff's legal mail was opened by accident. (Grondin Aff. at 4 ¶17; Peterson Aff. at 2 ¶7).

The plaintiff submits as evidence the opened envelope from Attorney Mayer. (Plaintiff's Ex. 21). It is stamped with the words "Open in the Presence of the Inmate" across the front, and a warning that the contents are attorney-client privileged across the back. (Plaintiff's Ex. 21). Defendant Grondin claims that she does not remember receiving mail addressed to the plaintiff from attorney Mayer , but if she

accidentally opened the mail and then realized that it came from an attorney, she would have scanned the mail, but not read it. (Grondin Aff. at 4 ¶¶ 14-17). The plaintiff has not provided a copy of the opened letter from the Milwaukee Clerk of Court.

It is well established that prison inmates are not stripped of all First Amendment rights at the prison gate. See *Turner v. Safley*, 482 U.S. 78, 84 (1987). Furthermore, the Fourteenth Amendment affords prisoners a due process rights to adequate, effective, and meaningful access to the courts. *Lewis v. Casey*, 518 U.S. 343, 351 (1996); *Bounds v. Smith*, 430 U.S. 817, 824 (1977). As a corollary of both the prisoner's right to access the courts and his limited free speech rights, a prisoner has a right to be free from certain interference with their "legal" mail. *Wolff v. McDonnell*, 418 U.S. 539, 577 (1974). Therefore, "legal mail," that is, mail from an attorney, can only be opened in the presence of the inmate. *Wolff*, 418 U.S. at 577; *Bach v. People of State of Ill.*, 504 F.2d 1100, 1102 (7th Cir. 1974). However, prison officials need not open legal mail in an inmate's presence unless it is clearly marked as coming from an attorney. *Id*.

In *Martin v. Brewer*, 830 F.2d 76, 77 (7th Cir. 1987), the court addressed a federal prison's practice under the regulations of treating all incoming mail as general correspondence which the prison can open and read before delivering to the inmate, unless the envelope is marked "Special Mail - Open only in the presence of the inmate." "Special Mail," under 28 C.F.R. § 540.2(c) includes correspondence received from an inmate's attorney, mail from the courts, and mail from public officials. *Id*. Concerning correspondence from an inmate's attorney, the court stated:

> To assist the prison personnel in determining whether such mail should be treated as special mail, the regulations require as we noted earlier that the prisoner advise his attorney to place the special legend on the envelope. This requirement is easy to comply with and therefore presents no serious constitutional question; the cost of compliance being essentially zero, the restriction on free speech is trivial; so is the restriction on the inmate's access to the courts.

*Id*. at 78. Thus, incoming mail from an attorney may be opened out of an inmate's presence before delivery unless it bears such a warning. *Id*.

Mail to an inmate from a court is not considered to be privileged mail that must be opened in the inmate's presence:

> [W]ith minute and irrelevant exceptions all correspondence from a court to a litigant is a public document, which prison personnel could if they want inspect in the court's files. It is therefore not apparent to us why it should be regarded as privileged and how [plaintiff] could be hurt if the defendant read those documents before or after [plaintiff] does.

*Id.; see also, Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1995) (prison officials can open official mail sent by a court clerk to an inmate without infringing on any privacy right); *Jones v. Sheahan*, 2002 WL 959814, 2 (N.D. Ill. 2002) (two letters from the Clerk of the United States District Court and the letter from the Clerk of the Circuit Court of Cook County are not privileged mail, although they had been stamped "LEGAL MAIL - OPEN IN PRESENCE OF INMATE"); *Stone-El v. Fairman*, 785 F. Supp. 711, 716 (N.D. Ill. 1991) (letters from the Clerk of Court and the like are not privileged and may be opened).

Six years after *Martin*, the Seventh Circuit Court of Appeals stated that it approved of the treatment of "all incoming mail" as general correspondence which may

be opened and read out of an inmate's presence before delivery unless it bears a warning such as "LEGAL MAIL - OPEN IN PRESENCE OF INMATE." *Castillo v. Cook County Mail Room Dep't*, 990 F.2d 304, 306 n.1 (7th Cir. 1993) (citing *Martin*, 830 F.2d 77-79); *see also, Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997).

Wisconsin Administrative Code § DOC 309.04 provides prisoners with greater privacy concerning incoming legal mail than is required by the United States Constitution. Under § 309.04, "legal mail" is mail that is clearly identifiable as being from one or of the following parties: 1) an attorney; 2) the Governor of Wisconsin; 3) members of the Wisconsin Legislature; 3) members of the United States Congress; 5) the Secretary of the DOC; 6) the Administrator of the Division of Adult Institutions; 7) the Attorney General or an Assistant Attorney General of Wisconsin; 8) an investigative agency of the federal government; 9) the clerk or judge of any state or federal court; or 9) the President of the United States. Wis. Admin Code § DOC 309.04(3). All mail that does not fall under the above categories will be opened and inspected by institution mailroom staff. *Id.*

The plaintiff's letter from the Clerk of Court in Milwaukee falls within the parameters of Wisconsin Administrative Code § 309.04. However, failure to follow state administrative procedures or state law does not necessarily give rise to a constitutional violation. The Seventh Circuit has held that mail to an inmate from a court need not be opened in an inmate's presence. *See Martin*, 830 F.2d at 78. The mere fact that the conduct in question violates DOC regulations does not per se form the basis of §1983 liability. *Kompare v. Stein*, 801 F.2d 883, 888 (7th Cir. 1986). Section 1983 of Title 42,

United States Code, addresses violations of federal law and the United States Constitution; it is not a means to redress violations of state procedures. *See Sandin v. Connor*, 515 U.S. 472, 478-83 (1995); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Moreover, negligence does not rise to the level of a constitution violation under § 1983. *Kincaid v. Vail*, 969 F.2d 594, 602 (7th Cir. 1992).

As noted, the letter from Attorney Mayer to the plaintiff was clearly marked as containing privileged and legal information. However, the plaintiff has produced no evidence to show that this mail was not opened accidently. *See Kaufman v. Smith*, Case No. 00-C-1379 (E.D. Wis. July 16, 2003) (plaintiff's failure to provide evidence that the defendants negligently opened two pieces of clearly marked legal mail was fatal to his legal mail claim). Negligence is not actionable under 42 U.S.C. § 1983. *Kincaid*, 969 F.2d at 602. The plaintiff's speculation as to the defendants' intent in opening the letters is not enough to withstand summary judgment. *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001); *see also, Gardner*, 109 F.3d at 431 (no constitutional rights violated by inadvertent opening of inmate's legal mail outside of presence of inmate). Moreover, there is no allegation that the opening of the plaintiff's mail was "the result of a content-based prison regulation or practice." *See Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999). To the contrary, there is a policy in place requiring that various types of mail be opened in the presence of inmates.

While the court does not condone the mere negligent opening of the plaintiff's mail, the evidence presented by the plaintiff fails to show that the defendants' conduct was more than negligent. In light of the foregoing, the plaintiff's claim does not

rise to a constitutional magnitude and the defendants are entitled to summary judgment on the plaintiff's legal mail claim.

**B. Reading Materials**

**1. Claims 10 and 11: Denial of Newspaper Clippings and Copies of Downloaded Internet Material**

The plaintiff alleges that defendants Weeden, Berge, Frank, and O'Donnell illegally contrabanned his incoming mail on September 17, 2002 because it contained newspaper photocopies and downloaded internet material. (Complaint at ¶ 23). The plaintiff further complains that defendants Berge, Frank and O'Donnnell are illegally enforcing a blanket ban on all downloaded internet materials from being mailed to the plaintiff from family and friends. (Complaint at ¶ 24). Defendants contend that because WSPF has lifted its ban on newspaper photocopies and downloaded internet materials, the plaintiff can only seek money for past alleged violations.

WSPF lifted its ban on newspaper clippings and internet copies in May 2003, two months before the plaintiff filed this lawsuit. (Berge Aff. at 8 ¶37). In *Lindell v. Frank,* 2003 WL 23198509 (W.D. Wis. May 5, 2003), district court Judge Crabb held that there was not a reasonable relationship between WSPF's policy prohibiting prisoners from receiving all clippings and photocopies, and limiting inmates' ability to receive hidden messages that might relate to criminal activities. *Id.* at 16. Thus, WSPF currently allows inmates to possess a maximum of five newspaper or magazine clippings at a time, and internet photocopies that comply with Wisconsin Administrative Code DOC §

309.04(4). (Berge Aff. at 8 ¶37). Therefore, the plaintiff's claim that the defendants currently enforce a blanket ban on these materials warrants no further discussion.

It is undisputed that prior to May 2003, newspaper clippings and photocopies of downloaded internet material mailed to a WSPF inmate were rejected for delivery. (Berge Aff. at 7, 8 ¶ 37). The defendants contend that Weeden was following appropriate DOC procedures when he denied the plaintiff his materials on September 17, 2002, (Berge Aff. At 7, 8 ¶ 36), and that they are entitled to qualified immunity.

Qualified immunity is an affirmative defense. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). In assessing whether a defense of qualified immunity is applicable, the court must address two questions: 1) whether the plaintiff has asserted a violation of a constitutional rights; and 2) whether the applicable constitutional standards were clearly established at the time in question. *Levenstein v. Salafsky*, 164 F.3d 345, 351 (7th Cir. 1998); *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir. 1996).

The Seventh Circuit has previously held that the defendants are entitled to qualified immunity on this claim.

> Neither the United States Supreme Court nor the Seventh Circuit has ruled that a prison policy prohibiting inmates from receiving newspaper clippings or photocopies in the mail violates the First Amendment. That would not foreclose the possibility of finding a right clearly established if there is 'such a clear trend in the case law that we can say with fair assurance that the recognition of the right by controlling precedent was merely a matter of time.' However, there is no clear trend on the issue of the application of a publisher's only rule to newspaper clippings and photocopies.

*Lindell*, at 18.

Similarly, the plaintiff in the case at bar complains that WSPF's policy against newspaper clippings and copies of downloaded internet material violates his First Amendment rights. However, as noted above, the plaintiff has not demonstrated a violation of his constitutional rights and the law was not clearly established at the time the policy was in effect. Therefore, this court adopts the holding in *Lindell* in finding that the defendants are entitled to qualified immunity. Accordingly, this claim shall be dismissed.

**2. Claims 21, 22 and 23: Denial of Publications**

The plaintiff alleges that defendants Hallet, Berge, Litscher, O'Donnell, and John and Jane Does denied him books, magazines, newspapers, catalogs and newsletters. (Complaint at 46-48). The plaintiff makes the following claims regarding his denial of reading materials:

> Claim 21: From July 24, 2000 to mid September 2000, and from December 7, 2000 to September 6, 2001, defendants Hallet, Bertrand, O'Donnell, Litscher, and John and Jane Does illegally deprived plaintiff of all his books, magazines, newspapers, catalogs, and newsletters.
>
> Claim 22: From September 6, 2001 to October 26, 2001, and from December 7, 2001 to approximately May 7, 2002, defendants Berge, Litscher, O'Donnell and John and Jane Does illegally deprived plaintiff of all his personal reading materials, except one religious text.
>
> Claim 23: Since September 6, 2001, defendants Berge, Litscher, O'Donnell and John and Jane Does illegally deprived plaintiff of all his personal and SMCI's magazines, newspapers, newsletters and catalogs.

Inmates retain a limited constitutional right to receive and read materials that originate outside the prison. *Thornburgh v. Abbott*, 490 U.S. 401 (1989). Prison actions that affect an inmate's receipt of non-legal mail must be "reasonably related to

legitimate penological interests." *Id*. at 409; *Turner*, 482 U.S. at 89-90; *Bell*, 441 U.S. at 559-60.

It is undisputed that the plaintiff was confined in segregation at GBCI and lower level status at WSPF during the periods that he was denied his reading materials. (Bertrand Aff. at 2, 3 ¶ 6). From July 24, 2000 to mid September 2000, and from December 7, 2000 to September 6, 2001, the plaintiff was in program segregation, temporary lock-up, adjustment segregation, clinical observation and control segregation at GBCI. (Betrand Aff. At 2, 3 ¶ 6). The plaintiff was provided with the 1999 and 2000 versions of the "GBCI Segregation Unit Handbook." (Bertrand Aff . At 3 ¶ 7). Both editions state that "no magazines or newspaper are permitted including personal and state issue." (Defendants' Ex. 1014).

Furthermore, when the plaintiff entered WSPF on September 6, 2001, he was placed on Level 1 supervision. (Berge Aff. At 9 ¶ 47). The plaintiff was provided with the November 2000 handbook, which outlines the privileges available to inmates as they progress through the level system. (Berge Aff. At 10 ¶ 50). Inmates in Level 1 are allowed to possess one soft covered religious book. (Defendants' Ex. 28). Level 1 inmates are not allowed to receive magazines, catalogs, newsletters, or other books. (Defendants' Ex. 28).

The plaintiff has not progressed past level 2 at WSPF. (Berge Aff. At 11 ¶ 54). Level 2 inmates are not allowed to possess books, newspapers, magazines and catalogs. (Defendants' Ex. 28). WSPF collects and retains any of these prohibited reading materials received by the plaintiff. (Berge Aff. At 11 ¶ 55).

The Wisconsin Administrative Code sets forth the reading materials allowed to inmates in adjustment, program, or control segregation. Wis. Admin. Code §§ DOC 303.69, 303.70 and 303.71. Those sections provide:

> **303.69(2)(d) Adjustment segregation:** The institution shall provide inmates in adjustment segregation with the following: Holy books
> **303.69(3)** The institution may allow inmates in adjustment segregation access to material pertaining to legal proceedings and law books or other property provided by the institution.
>
> **303.70(2)(d) Program Segregation:** The institution shall provide the following for each inmate in program segregation or disciplinary segregation, but the items need not be kept in the cell, as determined by the warden based on safety and security concerns: Holy Books
> **303.70(3)** The institution may allow inmates in adjustment segregation access to material pertaining to legal proceedings and law books or other property provided by the institution.
>
> **303.71(6)(a) Controlled segregation:** the institution shall not allow any property except that in (2) and (3) [hygiene items and clothing], letters received while in control status and legal materials.

*Id.*

In his allegations, the plaintiff pleads himself out of court. See *Walker v. Department of Corrections,* 2002 WL 32341702 at 14 (W.D. Wis. 2002) (petitioner pleaded himself out of court on First Amendment claim when he admitted that reading materials denied only in segregation). By alleging that his magazine subscriptions are withheld from him only when he is in segregation, he implies that inmates in general population, including himself when he is not in segregation, are not restricted in the same manner. *Id*. Moreover, these limitations are instituted to: 1) motivate inmates to not commit offenses that put them on segregation status; and 2) reduce the amount of paper in the inmates' cell to prevent inmates from covering their cell windows to obscure

corrections officers' view, and to prevent effective cell searches. (Betrand Aff. At 4 ¶ 11). Only one inference can be drawn: restricting the periodicals and other reading materials of inmates in segregation is part of an incentive program that furthers a legitimate penological interest. See *Tiggs v. Berge*, 2001 WL 34377567 at 16 (W.D. Wis. 2001).

Finally, WSPF's policy of denying low level status inmates access to ceratin publications has been upheld on numerous occasions. *Jones 'El v. Berge*, 2000 WL 34237510, 14 (W.D. Wis. 2000); *Tiggs*, at 14; *Freeman v. Litscher*, 2002 WL 32348356, 5 (W.D. Wis. 2002); *Cherry v. McGinnis*, 2002 WL 32350051, 13 (W.D. Wis. 2002). Therefore, the plaintiff's claim shall be dismissed.

## C. ACCESS TO THE COURTS

The plaintiff claims that in October and November 2002, defendant Berge denied him access to the courts by refusing to provide the plaintiff with photocopies of Wisconsin Administrative Code § DOC 310 and an old SMCI handbook that the plaintiff wanted to include in his lawsuits. (Complaint at ¶¶ 41, 42). The defendants contend that they did not supply the plaintiff with his requested copies because the plaintiff's DOC legal loan was not intended for purchasing photocopies of general legal research materials. (Berge Aff. at 13 ¶ 64 to 16 ¶ 76).

It is well settled that prisoners have a constitutional right to meaningful access to the courts to pursue post-conviction remedies and to challenge the conditions of confinement. *Bounds,* at 821-22. However, a prisoner's right of access is not unconditional. *Caldwell*, 790 F.2d at 606 ("The constitutionally relevant benchmark is

meaningful, not total or unlimited access."). A complaint of denial of access to the courts requires not only that there have been interferences with the plaintiff's ability to communicate with a court, but also that the plaintiff has suffered "actual injury." *Lewis*, at 348-49. Actual injury includes, but is not necessarily limited to, prejudice to contemplated or existing litigation, such as a plaintiff's missing a filing deadline or being foreclosed from presenting a certain claim to the courts. *Id.* at 351. An allegation of delay of the prisoner's litigation is not enough to state a claim for denial of access to the courts. *Gentry v. Duckworth*, 65 F.3d 555, 559 (7th Cir. 1995).

It is undisputed that the plaintiff's cases, numbered 02-IP-431 and 02-C-13-S, were dismissed with prejudice. (Complaint at 5). Each year, DOC inmates are able to obtain a $200 legal loan for supplies, photocopies, and postage to allow them access to the courts. (Berge Aff. at 13 ¶ 64). The legal loan is not intended to cover the expenses of photocopying legal research materials. (Berge Aff. at 13 ¶ 66). Inmates may purchase paper to hand copy legal research materials. (Berge Aff. at 13 ¶ 66). The $200 limit may be extended by the warden if there is an extraordinary need, such as a court order requiring submissions of specific documents. (Berge Aff. at 13 ¶ 65).

The Wisconsin Department of Corrections legal loan provision provides:

**DOC 309.51 Funds for legal correspondence and copying.** (1) Correspondence to courts, attorneys, parties in litigation, the inmate complaint review system under ch. DOC 310 or the parole board may not be denied due to lack of funds, except as limited in this subsection. Inmates without sufficient funds in their general account to pay for paper, photocopy work, or postage may receive a loan from the institution where they reside. No inmate may receive more than $200 annually under this subsection, except that any amount of the debt the inmate repays during the year may be advance to the inmate again without counting against the $200 loan limit. The $200 loan limit may be exceeded with the superintendent's

approval if the inmate demonstrates an extraordinary need, such as a court order requiring submission of specified documents. The institution shall charge any amount advanced under this subsection to the inmate's general account for future repayment. An inmate may be permitted to retain in the inmate's general account an amount of money specified, in writing, by the bureau of adult institutions that is not subject to repayment of the loan.

Wis. Admin. Code § DOC 309.51(1).

The plaintiff obtained a $200 legal loan and signed a "Loan Repayment Agreement" (Agreement) on December 26, 2001. (Berge Aff. at 14 ¶¶ 69, 70). In signing the Agreement, the plaintiff agreed to abide by the terms of DOC Internal Management Procedure 29 (IMP 29). (Berge Aff. at 14 ¶¶ 69, 70). IMP 29 provides:

> **Photocopies:** Shall be limited to copies of inmate personal legal documents. Photocopying of legal research materials is prohibited under this procedure.

Id. (Defendants' Exhibit 1032).

Defendant Berge denied the plaintiff's request for copies of Wisconsin Administrative Code DOC 310 to be used as an exhibit in case number 02-IP-431 because the court and judges have access to the Wisconsin Administrative Code and thus the plaintiff did not fall into "extraordinary need" exception. (Berge Aff. at 14, 15 ¶ 73). [5] Similarly, defendant Berge denied the plaintiff's request for copies of an old SMCI handbook to be used as an exhibit in case number 02-C-13-S because he did not find it to be an extraordinary need due to the fact that the WSPF office received a copy of

---

[5]The plaintiff contends that the courts and judges do not have access to the Wisconsin Administrative Code. While the court appreciates the plaintiff's argument, the United States District Court for the Eastern District of Wisconsin has a law library that provides access to the Wisconsin Administrative Code.

"Amended Judgment in a Civil Case" for case number 02-C-13-S, dismissing the plaintiff's claims with prejudice. (Berge Aff. At 15, 16 ¶ ¶ 75, 76).

The plaintiff claims that he had an extraordinary need to file a motion for reconsideration because Judge Shabaz relied on the current SMCI handbook to come to some of his conclusions. (Plaintiff's Response to Defendants' Proposed Findings of Fact ¶ 259). However, in the plaintiff's request for copies of the old SMCI handbook, he does not explain why he needed copies of the old SMCI handbook. (Defendants' Ex. 1035). A claim for denial of access to the courts must involve intentional interference; negligent conduct by a government official is insufficient to support a claim under § 1983. *Harrell v . Cook*, 169 F.3d 428, 432 (7th Cir. 1999). In addition, the plaintiff's request for copies of the Wisconsin Administrative Code does not constitute an extraordinary exception because the court could decide the plaintiff's case without the plaintiff's submissions. Accordingly, this claim will be dismissed.

## D. PROPERTY

### 1. Claims 25 & 26: Misplaced Magazines

The plaintiff claims that defendants Wetter, Lomen and John and Jane Does illegally contrabanned, misplaced and destroyed his magazines. (Complaint ¶¶ 49-50). The defendants contend that the plaintiff was reimbursed for his lost items and cannot state a due process claim.

To establish a procedural due process violation, a prisoner must demonstrate that the state deprived him of a liberty or property interest created either by state law or the Due Process Clause itself. See *Sandin,* at 483-84 (1995). If a deprivation

of property did not occur as the result of some established state procedure (which the plaintiff does not allege) and state law provides an adequate post-deprivation remedy for redressing the missing property, due process has been satisfied. *Parratt*, 451 U.S. at 543-44; *see also Hamlin v. Vaudenberg*, 95 F.3d 580, 585 (7th Cir. 1996) (holding that Wisconsin's post-deprivation procedures are adequate, albeit in a different context). Wisconsin law provides tort remedies to individuals whose property has been converted or damaged by another. *See* Wis. Stat. §§ 893.34 and 893.51.

WSPF inmates housed on Levels 1 and 2 are not allowed to receive personal magazines. (Lomen Aff. at 2 ¶ 8). Any magazines that come into WSPF addressed to inmates on Levels 1 or 2 are stored in the WSPF property room. (Lomen Aff. at 2 ¶ 8). Defendant Lomen does not recall receiving the plaintiff's magazines, (Lomen Aff. at 3¶ 11-12) and he does not know what happened to the plaintiff's magazines after he submitted them to the WSPF property room. (Lomen Aff. at 3 ¶ 13).

In this case, the loss of the plaintiff's magazines was in spite of rather than because of state procedures. Such random and unauthorized conduct cannot be predicted. *See Hamlin,* 95 F.3d at 583. It is beyond the control of the state to prevent a property loss resulting from a random, unauthorized act that did not derive from any "established state procedure." *Easter House v. Felder*, 910 F.2d 1387, 1404 (7th Cir. 1990).

> When a deprivation is the result of a state actor's random and unauthorized conduct, the state cannot predict that such conduct will occur. As a result, it is futile or impossible for the state to guard against the deprivation by mandating additional pre-deprivation procedures. In this circumstance, "the State cannot be required constitutionally to do the impossible by providing pre-deprivation process."

*Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  The constitutional violation is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. *Id.* at 129.

It is undisputed that plaintiff was reimbursed $19.79 for his five lost magazines.  (Complaint at 50). The plaintiff has been provided with an adequate post-deprivation remedy. He was reimbursed for the cost of his magazines.  Moreover, the State of Wisconsin provides the plaintiff a remedy for redressing his missing publications. Accordingly, the plaintiff's claim shall be dismissed.

### 2. Claim 26: Contraband

The plaintiff also alleges that on December 27, 2001, defendant Berge confiscated his December 2001 edition of *Maxim* magazine because it contained three skin care products, and defendant John Doe destroyed the magazine prior to resolution of the plaintiff's inmate complaint filed on this issue.  (Complaint at ¶ 51).  The defendants contend that the magazine was placed on WSPF's "not allowed" publication list because it contained samples of skin care products and it was destroyed because the plaintiff failed to notify the Property Department as to his choice in disposing of the magazine.  (Berge Aff. at 12 ¶ 61; Defendants' Ex. 1030).

It is undisputed that a December 2001 edition of *Maxim* magazine containing skin care samples was sent to the plaintiff at WSPF.  (Defendants' Ex. 1029). The plaintiff was provided with a Notice of Non-Delivery of Mail signed November 29, 2001.  (Defendants' Ex. 1029). The Notice of Non-Delivery provided the plaintiff with the following options:

**OPTIONS:** SEND INTERVIEW REQUEST TO MAILROOM STATING WHAT YOU WOULD LIKE DONE
1. Send addressed envelope with Distribution Request of a stamped addressed envelope to mailroom to send out
2. Request item(s) to be sent to Property to send out on visit
3. Have item(s) destroyed

(Defendants' ex. 1029). The plaintiff's appeal of the non-delivery of his magazine was denied December 27, 2001. (Defendants' Ex. 1030). On January 2, 2002, the plaintiff was informed that the magazine was disposed of "according to policy at 9:00am on 1-2-02." (Defendants' Ex. 1031).

Prisoners have a limited interest in their mail under the First and Fourteenth Amendment. *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974). The inspection of personal mail for contraband is a legitimate prison practice, justified by the important governmental interest in prison security. *Gaines v. Laine*, 790 F.2d 1299, 1304 (7th Cir. 1986). Further interference with an inmate's personal mail must be reasonably related to legitimate prison interests in security and order. *Turner,* at 89. As discussed in a preceding section, WSPF's regulation denying Level 1 and 2 inmates access to books, newspapers, magazines and catalogs survives constitutional scrutiny under *Turner*.

The December 2001 edition of *Maxim*, unlike the plaintiff's other publications, was contraband. As such, it was not sent to the WSPF property room. The plaintiff had to decide how to dispose of the magazine. The plaintiff cannot delay making a decision and now claim that the defendants' illegally destroyed his property. Accordingly, the plaintiff's claim shall be dismissed.

**3. Claim 24: Destruction of Reading Materials**

The plaintiff maintains that defendants Wetter and John and Jane Does illegally destroyed 87 of his publications. (Complaint ¶ 49). It is undisputed that plaintiff has not progressed beyond Level 2 at WSPF. (Berge Aff. 10/25/04 at 11 ¶ 54). Thus, he has not earned the privilege of receiving personal newspapers or newsletters. (Berge Aff. At 11 ¶ 54). The plaintiff's newspapers, magazines, catalogs, etc. are collected and retained by property staff. (Berge Aff. At 11 ¶ 55). DOC inmates are subject to combined possession limit of 25 publications, such as books, magazines, newspapers, etc. (Berge Aff at 11 ¶55). When staff has collected 25 items on behalf of plaintiff, plaintiff can send them out of the institution, destroy them or donate them to the prison library. (Berge Aff. At 11 ¶ 55). If the plaintiff makes no decision, the items are disposed of according to institution policy. (Berge Aff. At 11 ¶ 55).

As noted, restricting the periodicals and other reading materials of inmates in segregation is part of an incentive program that furthers a legitimate penological interest. *Turner,* at 89. The plaintiff was allowed to choose how to dispose of his reading materials. He cannot now blame the defendants for disposing of his property when he failed to instruct them how to dispose of his magazines. Accordingly, this claim shall be dismissed.

## E. FREEDOM OF RELIGION

### 1. Claim 37:Ramadan Meal

The plaintiff alleges that during Ramadan 2002, defendants Overbo, Berge, and John and Jane Does retaliated against him by serving nutritionally inadequate food, insulting Ramadan participants by issuing an extra dessert, and repudiating the feast of

Eid-al-Fitr. (Complaint at 8). The defendants contend that they did not retaliate against the plaintiff and that he was served nutritional meals during Ramadan 2002.

An inmate retains the right to exercise his religious beliefs in prison. *Tarpley v. Allen County*, 312 F.3d 895, 898 (7th Cir. 2002). When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Alston v. DeBruyn*, 13 F.3d 1038, 1039 (7th Cir. 1994) (*quoting Turner,* at 89). Federal courts follow a two-step analysis in cases concerning restrictions of religious freedom:

> 1) the prisoner has the burden of showing:
>   a) that his beliefs are sincerely held, and
>   b) the claims is rooted in religious belief, not in purely secular or philosophical concerns.
> 2) If the prisoner successfully shows the above items, the government must then show that the prisoner's religious rights have been restricted for legitimate penological interests such as prison security and rehabilitation.

*Wisconsin v. Yoder*, 406 U.S. 205, 215-29 (1972). This court of appeals for this circuit has identified several factors which can be used in applying the "reasonableness" standard:

> a. "whether a valid, rational connection exits between the regulation and a legitimate government interest behind the rule";
> b. "whether there are alternative means of exercising the right in question that remain available to prisoners";
> c. "the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and
> d. "although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable."

*Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991) (*quoting Williams v. Lane*, 851 F.2d 867, 877 [7th Cir. 1988]) (additional quotation marks omitted). Since *Turner*, the

Seventh Circuit has repeatedly reaffirmed the right of prisoners "to practice their religion to the extent that such practice is compatible with the legitimate penological demands of the state." *Id.* at 686 (citing cases)

As long as reasonable accommodations are made for inmates' basic religious services and dietary needs, there is no deprivation of religious exercise. *Al-Alamin v. Gramley*, 926 F.2d 680, 688 (7th Cir. 1991). However, once the plaintiff has alleged a deprivation of religious exercise, then the court must balance the competing penological interests. Security interests, rehabilitation policies, institutional order and economic concerns are legitimate penological interests. *O'Lone*, 482 U.S. at 342; *Al-Alamin*, 926 F.2d at 686. However, prisons may not discriminate against a particular religion. *Al-Alamin*, 926 F.2d at 686.

The plaintiff submits that he was served "completely cold and nutritionally inadequate" snack bags that "were drastically below the daily calorie intake." (Complaint ¶ 71).[6] However, he does not dispute that the Ramadan 2002 menus were approved by DOC dietitians as meeting nutritional standards. (Broadbent Aff. at 3 ¶ 10).

Next, the plaintiff asserts that inmates participating in Ramadan were only served a calorie intake of 1,800 calories, while those not participating in Ramadan received a calorie intake of 2,800 calories. However, the plaintiff has not shown that inmates participating in Ramadan were served fewer calories.

---

[6]Inmates who participate in the Ramadan fast can only eat before sunrise and after sunset. (Broadbent at 2 ¶ 6). Thus, they receive their lunch and dinner meals together. *Id.*

Next, the plaintiff alleges that all the meat served for dinner was in sliced form, e.g. bologna, turkey, ham and roast beef slices. (Plaintiff's Response to Defendants' Proposed Findings of Fact ¶ 74). In addition, he claims:

> They never ever served us chicken anything since the 2001 Ramadan sunset meals during Ramadan. And said meals (cold cuts) were never all served together in 1 meal, i.e. bologna 1 night, turkey ham the next night, etc. The "apples, pineapple & peaches" came in the form of small fruit cup; the "cookies" were 2 cookies; & the "cakes" would be ½ of a cupcake.

(Plaintiff's Response to Defendants' Proposed Findings of Fact ¶ 74).

Taking the plaintiff's allegations as true, it is clear that the plaintiff in this case does not allege facts that indicate that prison officials have prohibited his free exercise of religion. He was given meals for the feast of Ramadan in 2002, but his diet was not to his liking. His meals are prepared in adherence to Muslim requirements, but he complains that WSPF gave him cold food. This complaint is based on the plaintiff's preferences for practicing his religion, not on whether he can freely exercise his religion.

The facts alleged show that WSPF makes special accommodations for providing inmates the opportunity to participate in the Ramadan feast. The fact WSPF makes these accommodations satisfies the First Amendment regardless of the plaintiff's complaints that the accommodations are not to his liking. *See, Al-Alamin*, 926 F.2d at 688. The fact that the plaintiff does not like the meals and that WSPF serves them cold is not of constitutional import. Prison administrators have limited resources to provide all services that inmates may demand. *Al-Alamin*, 926 F.2d at 686.

### 2. Claim 38: The feast of Eid-al-Fitr

The plaintiff complains that defendants Overbo, Berge and John and Jane Does repudiate the Islamic feast of El-aid-Fitr, and that they insulted Muslim inmates when they served an extra dessert to celebrate the meal for the El-aid-Fitr feast in 2001. (Complaint at ¶ 72).  In addition, he maintains that WSPF receives money that should be used for the El-aid-Fitr feast, but stole it and used it for other means.  *Id.*  The defendants contend that under Internal Management Procedure #6, inmates shall be permitted to participate in only one religious feast per year.

Internal Management Procedure #6 provides:

If required by that religion, one religious feast may be provided each year for each Umbrella Religion Group that has congregate services or a study group, based on the number of adherents, space availability, staff resources and security needs.

(Defendants' Ex. 1041 at 8).  "Umbrella Religion Group" is defined as "an inclusive group designed to appeal to a wide range of religious beliefs within a given faith group. E.g. Islam.  (Defendants Ex. 1041 at 4).  Religious feasts consist of regular institution meals, or special religious diet meals prepared by the institution.  (Overbo Aff. at 3 ¶ 10).

It is undisputed that the plaintiff was served a regular institution meal for the 2001 El-aid-Fitr feast meal.  (Plaintiff's Response to Defendants' Proposed Findings of Fact ¶ 287).

However, it appears from the plaintiff's own complaint, and from the affidavits of fellow inmates he submits, that the regular institution meal does not live up his expectations of a proper feast meal.

When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Alston*, 13 F.3d at1039. Internal Management Procedure #6 provides that:

> The Department of Corrections finds that the growth in institution inmate populations, limited space availability, increasing institution security needs, limited resources and health and safety concerns make it necessary that the Department implement uniform guidelines relating to inmate religious belief and practice that are applicable to all adult institutions, and that ensure equitable distribution of time, space and limited resources for inmates and religious groups.

(Defendants' Ex. 1041 at 1). The court of appeals in Mack v. -, 80 F.3d at, recognized the compelling governmental interest in avoiding the enormous burden on prison resources entailed by allowing every religious denomination to celebrate each of its festal occasions.

In *Charles v. Verhagen*, Judge Crabb upheld the constitutionality of allowing DOC inmates to celebrate one religious feast per year:

> Although plaintiff would like to celebrate two religious fasts each year, I am convinced that defendants' asserted security and resource concerns constitute a compelling interest justifying the religious feast regulation, as applied to plaintiff, and that it is the least restrictive means available to the defendants.

220 F. Supp. 2d 937, 953 (W.D. Wis. 2002) *aff'd on other grounds*, 348 F.3d 601 (7th Cir. 2003). Accordingly, the plaintiff's claim number 38 is dismissed.

### 3. Claims 41 and 42:Television Programming

The plaintiff claims that defendants Berge and Overbo violated the Establishment Clause when they purchased Christian television programming for WSPF

inmates and similar Islamic programming was not provided. (Complaint at 9). The plaintiff alleges:

> Defendants Overbo, Berge, John and Jane Does discriminated against plaintiff by purchasing a 24 hour a day, 7 days a week satellite Christian station, yet they refuse to purchase a 24 hour, 7 days a week Islamic satellite station.

> When compared to Christian access to Christian materials and tv programs, the same access to Islamic materials and tv programs is completely disproportionate and inadequate.

The defendants contend that the plaintiff has failed to establish a constitutional violation.

The Establishment Clause states that "Congress shall make no law respecting the establishment of religion." U.S. Const. amend. I, cl. 1. It prevents the government from promoting or affiliating with any religious doctrine or organization. *Freedom From Religion Found. v. Bugher*, 249 F.3d 606, 610 (7th Cir. 2001) (citing *County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 590 (1989). The Supreme Court has held that a governmental action may be unconstitutional if it amounts to religious preferentialism, either among religions or between religion and non-religion and irreligion. See e.g., *Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 703 (1994) ("[A] principle at the heart of the Establishment Clause [is] that government should not prefer . . . religion to irreligion."), *Epperson v. Arkansas*, 393 U.S. 97, 103-04 (1968) ("The First Amendment mandates government neutrality . . . between religion and nonreligion."), *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947) (declaring that the Establishment Clause prohibits laws that "prefer one religion over another").

The Court formulated a three-pronged test to determine whether a statute complies with the Establishment Clause. *See Lemon v. Kurtzman*, 403 U.S. 602 (1971).

Under the test, a statute does not violate the Establishment Clause if: 1) it has a secular legislative purpose; 2) its principal or primary effect neither advances nor inhibits religion; and 3) it does not create excessive entanglement between government and religion. *Id*. at 612-13. The Seventh Circuit has held that the Lemon test "remains the prevailing analytical tool for the analysis of Establishment Clause claims." *Books v. City of Elkhart, Indiana*, 235 F.3d 292, 301 (7th Cir. 2000).

The Court has occasionally articulated the first two prongs of the Lemon test in terms of an "endorsement test." *See County of Allegheny*, 492 U.S. at 592 (formally accepting the endorsement test and stating that "[i]n recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence"). Under the endorsement test, "'the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'" *Freedom from Religion Found*., 203 F.3d at 493 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring)). The Seventh Circuit adopted the endorsement test in *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001).

It is undisputed that prior to March 1, 2004, WSPF provided inmates with five television channels and two audio channels, and that WSPF selected one 24-hour, Christian-oriented show to broadcast as one of the five channels that it aired. (Sebastian

Aff. at 2 ¶ 4).[7] The remaining four channels were news or education-based programming, such as MSNBC, PBS, the History Channel or the Discovery Channel. (Sebastian Aff. at 2 ¶ 4, 6). WSPF's closed circuit television network offered additional religious programming, including information about the Muslim religion, from 9:00am to 4:00pm Monday through Friday. (Overbo Aff. at 4 ¶ 20).[8] The plaintiff can change the channel and turn off the television from inside his cell. (Sebastian Aff. at 4 ¶ 14).

In *Williams v. Berge*, WSPF's television programming selections survived an Establishment Clause challenge. Case No. 04-C-16-S (W.D. Wis. May 6, 2004). Judge Shabaz held:

> WSPF accompanied the broadcast of the Christian channel with four channels that aired 24 hour secular programming. Inmates were not compelled to watch the Christian channel. Muslim programming was available on closed circuit television and written materials were available. *WSPF's television programming did not have the purpose or effect of endorsing or disapproving religion.*

*Id*. at 6 (emphasis added). In addition, the court found that the plaintiff failed to show that the "airing of voluntary Christian programming fostered an excessive entanglement between government and religion" because inmates were not compelled to watch the Christian channel and other programs were available. *Id*. at 6.

*Williams* is directly on point with the case at bar: during the plaintiff's incarceration, WSPF accompanied the broadcast of the Christian channel with four

---

[7]After March 1, 2004, WSPF did not have to commit to choosing only one Christian-based show to air on its "Christian channel." (Sebastian Aff. at 3 ¶ 11). Rather, WSPF can now select between two Christian shows that it airs to inmates on the Christian channel. *Id*. Thus, the amount of Christian channels has not increased, while the variety of Christian programming on the one channel available to inmates arguably has.

[8]WSPF's satellite television provider does not currently offer a channel that carries 24-hour religious programming for any religion other than the Christian religion. (Sebastian Aff. at 3 ¶ 8, 12).

channels that aired 24-hour secular programming, the plaintiff was not compelled to watch the Christian channel, and he could turn off the television from his cell. Thus, the plaintiff does not state an Establishment Claus violation. Accordingly, the plaintiff's claim shall be dismissed.

## CONCLUSION

The plaintiff's claims that his rights under the First Amendment free exercise and establishment clauses, and the equal protection and due process clauses of the Fourteenth Amendment are dismissed.

## ORDER

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment is **GRANTED.**

Dated at Milwaukee, Wisconsin, this 8th day of September, 2005.

**SO ORDERED,**


s/ Rudolph T. Randa
**HON. RUDOLPH T. RANDA**
**Chief Judge**