# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RUFUS WEST,

        **Plaintiff,**

        **-vs-**                    **Case No.   03-C-0658**

CHAPLAIN OVERBO, et al.,

        **Defendants.**

# DECISION AND ORDER

Plaintiff, Rufus West, filed this *pro se* civil rights action pursuant to 42 U.S.C.

§ 1983 and is proceeding *in forma pauperis* on various claims. This matter comes before the

court on the defendants' second motion for summary judgment.

## I. FACTUAL BACKGROUND

On July 11, 2003, the plaintiff filed a § 1983 complaint against Chaplain Todd

Overbo, Matthew J. Frank, Jon E. Litscher, Cindy O'Donnell, Jeffrey P. Endicott, Warden

Daniel Bertrand, Warden Gerald A. Berge, Lt. Parker, Tim Douma, Laura Hallet, Unit

Manager Hompe, John Sharpe, S. Gronden, D. Weeden, SG, TM, Linda Hoddy-Tripp,

Michael Snodgrss, Chad Lomen, Sharon Peterson, Keith Weigel, Gary Wetter, Steven

Clevent, Matthew Scullio, Phillip Henneman, Robert Shannon, Rickie Govier, Christa

McCormick, Dean Fabry, Lester Neuman and John and Jane Does.

By order dated December 16, 2003, the court screened the complaint and permitted the plaintiff to proceed on claims concerning: (1) interference with his institutional mail; (2) access to reading materials; (3) destruction of personal property; (4) denial of access to the courts; and (5) restrictions on his ability to practice his religion. On October 29, 2004, the defendants filed a motion for summary judgment on these claims, which was granted on September 8, 2005. That same day, judgment was entered dismissing this action.

Subsequently, the plaintiff filed two motions for reconsideration of the September 8, 2005, decision and order granting the defendants' motion for summary judgment. The plaintiff was granted reconsideration as to Claims 3, 4, 25, 36 and 38, in which he alleges that his personal property was confiscated and destroyed in retaliation for using the administrative grievance procedure and he was prevented from properly observing a religious feast. The defendants have filed a motion for summary judgment on these claims, which is now fully briefed and ready for resolution.

## II. STANDARD OF REVIEW

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute to

2

be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id*. For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." *Id*.

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, *Anderson,* 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id*. at 248.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id*. at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id*. at 323-24. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v.*

3

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record - only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

### III. PRELIMINARY MATTERS

The plaintiff seeks to strike the portion of the defendants' motion pertaining to Claim 38. As grounds for his request, the plaintiff states that the defendants were never permitted to file a successive motion for summary judgment on this count. Either party may "renew a previously denied summary judgment motion or file successive motions, particularly if good reasons exist." *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995). "A renewed or successive summary judgment motion is appropriate especially if one of the following grounds exists: '(1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3) the need to correct a clear error or prevent manifest injustice.'" *Id.* (quoting *Kern-Tulare Water Dist. v. City of Bakersfield*, 634 F. Supp. 656, 665 (E.D. Cal. 1986)). The decision whether to permit a successive summary judgment motion lies within the discretion of the court. *Whitford*, 63 F.3d at 530; see also *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)("Permitting a second summary judgment motion is essentially a decision concerning case management, and district court judges are in the best position to make such decisions.").

As previously discussed, the defendants have been permitted to file a successive motion for summary judgment because no trial date has been set and it is in the

4

interest of judicial efficiency to provide the defendants an opportunity to show that there is no genuine issue of material fact as to the remaining claims. (*See* Order dated May 15, 2007). Although the court did not explicitly state that the defendants could move for summary judgment on Claim 38, the defendants were permitted to file a second summary judgment motion as to all remaining claims. *See id.* Thus, the court declines to strike the defendants' arguments concerning Claim 38.

## IV. RELEVANT UNDISPUTED FACTS[1]

The plaintiff, a state prisoner, is currently incarcerated at Columbia Correctional Institution (CCI). At all times relevant to this action, the plaintiff was housed at CCI, Wisconsin Secure Program Facility (WSPF) and Green Bay Correctional Institution (GBCI). (Affidavit of Amy M. Millard ¶ 8).[2]

The defendants were all employed by the State of Wisconsin Department of Corrections (DOC) when the alleged wrongdoing occurred. Defendants Rickie J. Govier and Chad Lomen were correctional officers at WSPF. (Affidavit of Rickie J. Govier [Govier Aff.] ¶ 1; Affidavit of Chad Lomen [Lomen Aff.] ¶¶ 1, 2). Defendant Dean Fabry was a correctional officer at CCI. (Affidavit of Dean A. Fabry [Fabry Aff.] ¶ 1). Defendant Timothy Douma was the security director of CCI from January, 1999, to April, 2005.

---

[1]The facts in this section are derived from the verified complaint and the plaintiff's affidavits, to the extent they are undisputed, and the defendants' first and second sets of proposed findings of fact, to the extent they are undisputed. *See* Civil L.R. 56.2 (E.D. Wis.).

[2]Amy Millard is not a defendant in this action. However, her affidavit attests to the plaintiff's institutional transfer history.

(Affidavit of Timothy A. Douma [Douma Aff.] ¶ 2).  Defendant Todd Overbo was the chaplain at WSPF.  (Affidavit of Todd T. Overbo [Overbo Aff.] ¶ 1).  Defendant Gerald Berge was the warden of WSPF.  (Affidavit of Gerald A. Berge [Berge Aff.] ¶ 1).  Defendant Jeffrey P. Endicott was the warden of Redgranite Correctional Institution (RGCI).  (Complaint [Compl.] at 1).

### Claim 3 - Confiscation of plaintiff's mail

On September 2, 1999, defendant Fabry was working at CCI on the housing unit where the plaintiff resided.  (Fabry Aff. ¶ 5).  On that date, the plaintiff handed defendant Fabry a manila envelope containing "legal papers" and asked Fabry to pass them to another inmate.  (Fabry Aff. ¶ 7).  Defendant Fabry reviewed the contents of the envelope and discovered that it contained a newsletter entitled "Knowledge, Wisdom & Understanding," which he did not believe to be a legal document or related to any legal action.  (Fabry Aff. ¶ 8).  Moreover, as defendant Fabry scanned the newsletter, he noticed that it included references to "King David," "Disciple Nation," and "Jeff Fort's Black P-Stone Nation," which he believed to be gang-related terms.  (Fabry Aff. ¶ 9).

DOC rules and regulations prohibit inmates from participating in any gang-related activity or possessing any kind of gang literature, creeds or symbols.  (Fabry Aff. ¶ 11).  Defendant Fabry is aware of the danger that gang activity poses for the safety and security of the institution, staff and inmates.  (Fabry Aff. ¶ 10).  Therefore, defendant Fabry confiscated the plaintiff's envelope and forwarded it to the gang coordinator for review.

6

(Fabry Aff. ¶ 12, Ex. 1044). Defendant Fabry had no other involvement with the plaintiff's envelope and he did not make any decision concerning its disposition. (Fabry Aff. ¶ 14).

### Claim 4 - Inspection of plaintiff's outgoing mail

On February 8, 1999, defendant Douma ordered that the plaintiff be subject to a confidential mail monitor. (Douma Aff. ¶ 12). The monitor was started due to concerns that the plaintiff was engaged in unauthorized group or gang-related activities. (Douma Aff. ¶ 14). On April 27, 1999, defendant Douma ordered that the monitor be removed. (Douma Aff. ¶ 13).

On April 27, 1999, the plaintiff filed Inmate Complaint CCI-1999-43786, complaining that his outgoing mail was being opened by CCI staff. (Affidavit of Thomas J. Gozinske [Gozinske Aff.] ¶ 7). The ICE recommended that the complaint be dismissed on May 3, 1999. (Gozinske Aff. ¶ 7). That same day, the reviewing authority accepted the ICE's recommendation and dismissed the complaint. (Gozinske Aff. ¶ 7).

On August 31, 1999, the plaintiff appealed the dismissal of Inmate Complaint CCI-1999-43786 to the Corrections Complaint Examiner (CCE). *Id*. On September 20, 1999, the CCE recommended that the appeal be dismissed as untimely. *Id*. The next day, the DOC Secretary accepted the recommendation and dismissed the complaint. *Id*.

At all times during the plaintiff's incarceration at CCI, staff had the authority to open and inspect incoming and outgoing non-legal mail under Wisconsin Administrative

Code § DOC 309.04. (Douma Aff. ¶ 6).[3] Staff who conducted the mail inspection or monitoring were not required to notify an inmate of the inspection, unless the mail was not delivered. (Douma Aff. ¶ 8). In the event the inspected mail was not delivered, a notice of non-delivery was completed and sent to the inmate. *Id*.

### Claim 25 - Destruction of plaintiff's magazines

On or about October 25, 2001, five of the plaintiff's magazines that were sent to him at WSPF went missing and were never delivered to him. (Compl. at 6 ¶ 4). Therefore, the plaintiff was reimbursed $19.79 for the publications. *Id*.

As a correctional officer, defendant Lomen is responsible for determining whether property received by an inmate is acceptable under DOC policies and procedures. (Lomen Aff. ¶ 2). In October, 2001, the plaintiff was housed in Level 1 at WSPF, where inmates are not allowed to receive magazines. (Lomen Aff. ¶ 8). If a magazine were to come into the institution and the inmate resides on Level 1, it would be stored in the property room, provided it is appropriate for delivery under Wis. Admin. Code §§ DOC 309.04 and 309.05. (Lomen Aff. ¶ 11). However, in the event that a publication was not appropriate for distribution to an inmate, staff would attach a property receipt to the publication and forward it to the property room. (Lomen Aff. ¶ 12). The inmate would then be advised that the publication is not allowed and he would be informed about his options for disposing of it. *Id*.

---

[3]Legal mail, however, was not to allowed to be opened outside the presence of the inmate. (Douma Aff. ¶ 11).

8

**Claim 36** - **Destruction of plaintiff's personal property**

On or around November 8, 2002, the plaintiff gave defendant Govier several manila envelopes to be sent out of the institution on a visit. (*See* Gozinske Aff. Ex. 1043). The plaintiff had a visitor on November 14, 2002. *Id.* However, by November 22, 2002, the plaintiff had not received a property receipt showing that his envelopes had been given to the visitor. *Id.*

On or about December 30, 2002, defendant Govier received a memorandum from the ICE regarding a complaint filed by the plaintiff. (Govier Aff. ¶ 11; Gozinske Aff. ¶ 8, Ex. 1043). The complaint alleged that defendant Govier took envelopes from the plaintiff that were to be sent out of the institution on a visit and that the property was never given to the plaintiff's visitor. (Gozinske Aff. Ex. 1043). The ICE found that it was unreasonable for the plaintiff's envelopes to disappear with no documentation of where the property went. *Id.* Therefore, it was recommended that the plaintiff's complaint be affirmed with modification, a recommendation that was affirmed by the reviewing authority. *Id.*

In 2002, WSPF permitted inmates to keep personal property in their cell so long as it fit into a box measuring 31" x 16" x 16". (Govier Aff. ¶ 5). If the inmate's personal property did not fit in this receptacle, he or she was required to dispose of any excess items. (Govier Aff. ¶ 6). One of the methods of disposing of property was to send it out of the institution with a visitor. (Govier Aff. ¶ 7). When property was sent out of the institution, a "Property Receipt/Disposition" form DOC 237 was to be completed. (Govier

9

Aff. ¶ 8). The inmate was to be provided with a copy of this form and the WSPF Property Department was responsible for maintaining a copy to document the receipt and disposal of inmate personal property. *Id.*

### Claim 38 - Denial of religious feast

In 2001, the plaintiff participated in the Eid-ul-Fitr feast meal, which consisted of the regular institution meal and an extra desert. (Overbo Aff. ¶ 13). Under DOC Internal Management Procedure #6, religious feasts consist of regular institution meals or special religious diet meals prepared by the institution. (Affidavit of Timothy J. Lundquist [Lundquist Aff.] ¶ 6). No outside food is permitted into any DOC institution for religious feasts or other special events involving a meal for inmates. *Id.*

There are two reasons why a religious feast may consist of a regular institution meal. *Id.* First, it is difficult to effectively search incoming food for contraband such as weapons or drugs. *Id.* Second, it is difficult for institution staff to ascertain whether food was prepared in sanitary conditions and maintained at the appropriate temperatures. *Id.*

The DOC recognizes that the institution menu for a religious feast meal should be consistent with the religious beliefs of that group. *Id.* Regardless of whether religious feasts consist of a regular institution meal or special religious diet meals, inmates are allowed to celebrate their religious feast by gathering with other inmate adherents and sharing the meal together. (Lundquist Aff. ¶ 8). In addition, inmates may also exercise their religious beliefs and practices in the following ways: (1) a special congregate service; (2) religious diet

10

request; (3) individual study; (4) personal meditation; (5) utilization of religious books or property; (6) individual religious observance in their living quarters; (7) correspondence with fellow believers; (8) pastoral visits; (9) additional foods meeting religious dietary principles either through purchase at the institution canteen or through approved donations; and (10) requesting to abstain from work or programs. *Id.*

## V. ANALYSIS

The defendants assert that they are entitled to summary judgment as to all claims. Specifically, the defendants contend that claims 4 and 36 should be dismissed because the plaintiff failed to exhaust his administrative remedies. Additionally, the defendants argue that there is no genuine issue of material fact as to any of the remaining claims.

### A. Exhaustion

The defendants contend that the plaintiff failed to exhaust claims 4 and 36. The Prison Litigation Reform Act of 1995 (PLRA), Pub. L. 104-134, 110 Stat. 1321 (1996), provides that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997(e)a. Section 1997e applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or

11

some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). A prisoner's failure to exhaust administrative remedies before bringing a § 1983 suit is an affirmative defense, which defendants must raise. *Jones v. Bock*, 127 S. Ct. 910 (2007). The Inmate Complaint Review System (ICRS) within the Wisconsin prisons is the administrative remedy available to inmates with complaints about prison conditions or the actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). The Wisconsin Administrative Code specifically provides that before an inmate may commence a civil action, the inmate shall exhaust all administrative remedies that the Department of Corrections has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is available for inmates to "raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code § DOC 310.08(1).

In order to use the ICRS, an inmate must file a complaint with the inmate complaint examiner (ICE) within 14 days after the occurrence giving rise to the complaint. Wis. Admin. Code §§ DOC 310.07(1) & 310.09(6). Complaints submitted later than 14 days after the event may be accepted for good cause. Wis. Admin. Code § DOC 310.09(6). After reviewing and acknowledging each complaint in writing, the ICE either rejects the complaint or sends a recommendation to the "appropriate reviewing authority." Wis. Admin. Code §§ DOC 310.11(2) & 310.11(11). The appropriate reviewing authority makes a decision within 10 days following receipt of the recommendation. Wis. Admin. Code § DOC 310.12. Within 10 days after the date of the decision, a complainant dissatisfied with a reviewing

12

authority decision may appeal that decision by filing a written request for review with the corrections complaint examiner (CCE). Wis. Admin. Code § DOC 310.13(1). The CCE reviews the appeal and makes a recommendation to the secretary of the Department of Corrections. Wis. Admin. Code § DOC 310.13(6). The secretary may accept, adopt, or reject the CCE's recommendation, or return the appeal to the CCE for further investigation. Wis. Admin. Code § DOC 310.14(2).

**Claim 4**

The defendants submit that the plaintiff failed to exhaust Claim 4, in which he complains about his mail being monitored. It is undisputed that on April 27, 1999, the plaintiff filed Inmate Complaint CCI-1999-43786, asserting that his outgoing mail was being opened by CCI staff. The ICE recommended dismissal of the complaint on May 3, 1999. That same day, the reviewing authority accepted the ICE's recommendation and dismissed the complaint. On August 31, 1999, the plaintiff appealed the dismissal of the complaint to the CCE. On September 20, 1999, the CCE recommended that the appeal be dismissed as untimely. The next day, the DOC Secretary accepted this recommendation and dismissed the complaint.

With respect to Inmate Complaint CCI-1999-43786, the plaintiff was required to file his appeal to the CCE within 10 days after receiving a decision from the ICE. However, the plaintiff did not appeal the dismissal of the complaint for more than two months after the ICE issued a decision. The PLRA exhaustion requirement requires "proper

13

exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 126 S.Ct. 2378, 2384, 2387 (2006); *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require").  When a prisoner causes the unavailability of the grievance process by failing to file a grievance in a timely manner, the process is not unavailable but rather forfeited." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  Therefore, the plaintiff failed to exhaust claim 4.

### Claim 36

The defendants submit that the plaintiff failed to exhaust Claim 36, in which he alleges that defendants Govier retaliated against him by stealing his manila envelopes. It is undisputed that the plaintiff filed Inmate Complaint WSPF-2002-42270 on December 2, 2002, complaining that he gave defendant Govier several envelopes to be sent out on a visit that were never received by his visitor.  On December 4, 2002, the ICE recommended that the complaint be affirmed with modification.  That same day, the reviewing authority accepted the recommendation of the ICE and affirmed Inmate Complaint WSPF-2002-42270 with modification.

The defendants contend that the plaintiff was required to appeal the decision of the reviewing authority in order to properly exhaust his administrative remedies. However, because an affirmed complaint is not an adverse decision under the Wisconsin

14

Administrative Code, an inmate does not have to appeal an affirmed complaint to exhaust administrative remedies. *Dixon v. Page*, 291 F.3d 485, 490 (7th Cir. 2001)("Requiring a prisoner who has won his grievance in principle to file another grievance to win in fact is certainly problematic.").

The defendants also contend that Inmate Complaint WSPF-2002-42270 failed to put prison officials on notice of the plaintiff's retaliation claim. One purpose of the exhaustion requirement is to allow prison officials time and opportunity to respond to complaints internally before an inmate initiates litigation. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *see Smith v. Zachary*, 255 F.3d 446, 450-51 (7th Cir. 2001). To provide officials with sufficient notice, inmates must file grievances at the place and time and with the information required by the prison's administrative rules. *Strong v. David*, 297 F.3d 646, 649 (7th Cir. 2002). Where the rules are silent, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Id*. at 650; *see Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004). With respect to the level of detail in an offender complaint, the DOC administrative rules require that offender complaints filed by an inmates "[c]ontain only one issue per complaint, and shall clearly identify the issue." Wis. Admin. Code § DOC 310.09(1)(e).

In the present case, the plaintiff complained in Inmate Complaint WSPF-2002-42270 that "he gave CO R. Govier several manila envelopes full of medical records, letters, conduct reports, 3 photos & miscellaneous papers to be sent out on a visit." (Pl's Decl. Ex.

15

10). When the plaintiff did not get a property receipt showing that his items had been sent out, he contact defendant Govier, who indicated that "the lobby dept probably forget to give it to my visitor & he suggested that I write to the lobby dept." *Id*. The complaint does not accuse defendant Govier of retaliation or even allege that he wrongly disposed of the plaintiff's envelopes.

The Seventh Circuit has held that allegations that prison officials retaliated against an inmate are claims of "prison conditions" under the PLRA, requiring exhaustion before filing a § 1983 action in federal court. *Johnson v. Litscher*, 260 F.3d 826, 828 (7th Cir. 2001). Based on the information in the plaintiff's inmate complaint, the court is not satisfied that he properly alerted the defendants to the nature of the wrong for which redress is sought. *See Strong,* 297 F.3d at 650. Thus, the plaintiff failed to exhaust Claim 36.

In sum, the plaintiff failed to exhaust Claims 25 and 36 and summary judgment will be granted as to these claims. The court will now address the remaining counts, Claims 3, 25 and 38.

## B. Claim 3 - Seizure of plaintiff's mail

In Claim 3, the plaintiff alleges that defendant Fabry illegally confiscated his envelope because Fabry disagreed with the views expressed in the materials contained therein. In response, the defendants contend that the plaintiff's mail was seized because it contained references to unauthorized group or gang-related activities. Prisoners have a protected First Amendment interest in both sending and receiving mail. *Rowe v. Shake*, 196

16

F.3d 778, 782 (7th Cir. 1999). Confiscation of prisoner mail is constitutionally permissible "if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989)(upholding prison mail censorship regulations). Under this standard, four factors are relevant. *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). First, "there must be a 'valid, rational connection between the prison regulation and the legitimate and neutral government interest put forward to justify it." *Id.* In addition, the court should consider the following: (1) the existence of "alternative means of exercising the right available to inmates;" (2) the impact accommodation of the asserted right will have on guard and other inmates and on the allocation of prison resources generally; and (3) the absence of ready alternatives available to the prison for achieving the governmental objectives. *Id.*

In the present case, it is undisputed that defendant Fabry confiscated the plaintiff's envelope because it contained a newsletter that made references to "King David," "Disciple Nation," and "Jeff Fort's Black P-Stone Nation." Defendant Fabry recognized these terms as being gang-related. After viewing the contents of the envelope, defendant Fabry forwarded it to the prison gang coordinator for further review.

Courts recognize that gangs pose a "serious challenge" to institutional security. *Young v. Lane*, 922 F.2d 370, 376 (7th Cir. 1991). Therefore, it is well-established that prisons have a legitimate interest in curbing gang activity. *Wilkinson v. Austin*, 545 U.S. 209, 227 (2005). Whether a publication contains gang-related symbols is "an assessment that

17

prison staff is uniquely suited to make." *Koutnik v. Brown*, 456 f.3d 777, 786 (7th Cir. 2006).

According to the plaintiff, defendant Fabry seized his mail not because it contained gang-related material, but because Fabry did not like the message in the newsletter. The plaintiff further avers that the information in the newsletter was legal in nature because it cited *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), and that there is "nothing explicitly or implicitly gang-related about making references to King David, Disciple Nation & Jeff Fort's Black P-Stone Nation, in the context of legally (& historically) educating a fellow prisoner." (Pl.s' Resp. to Def.'s Mot. for Summ. Judg. at 4).

Although *Hampton* mentions Jeff Fort, Mr. Fort is the former leader of a Chicago-based gang known as the Black P-Stone Nation. *See United States v. Cogwell*, 486 F.2d 823, 828 (7th Cir. 1973)("Jeff Fort was the leader of the Black P. Stone Nation, a conglomerate of several Blackstone Ranger gangs[.]"). Moreover, the plaintiff does not dispute that the newsletter also referenced "King David" and "Disciple Nation," terms that are also gang-affiliated but are not mentioned in *Hampton*. *See United States v. Irwin*, 149 F.3d 565, 567 (7th Cir. 1998)("King David" refers to David Barksdale, the former leader of another Chicago-based gang, the Black Gangster Disciple Nation).

Courts give significant deference to the assessment made by prison administrators as to whether a publication contains gang-related symbols. *George v. Smith*, 467 F. Supp. 2d 906, 920 (W.D. Wis. 2006). Whether the plaintiff's use of these terms is

18

gang-related is far from the court's area of expertise, in part because "knowledge of prison gang symbols - how they are used and what they mean - is acquired primarily through interaction with, and observation of, prisoners." *Id.* (citing *Koutnik v. Brown*, 456 F.3d 777, 785 (7th Cir. 2006)). Further, "gang symbolism is not static; symbols change and are added as gangs expand their bases and combine with other groups." *Koutnik*, 456 F.3d at 785 (citing *Beard v. Banks*, 126 S. Ct. 2572, 2578 (2006)). Thus, the court finds that defendant Fabry acted within his discretion in concluding that the plaintiff's newsletter contained gang-related references in violation of DOC rules and regulations prohibiting inmates from participating in any gang-related activity or possessing any kind of gang literature, creeds or symbols.[4]

There remains the issue of whether the interests asserted by the state, curbing gang activity and ensuring institutional security, were furthered by the seizure of the plaintiff's mail. *See West v. Frank*, 492 F. Supp. 2d 1040, 1048 ("it is not enough for the interest to be a valid one; defendants must also show that the interest is furthered by the [action]."). For several reasons, the court is persuaded that the defendants have satisfied this requirement.

First, it is undisputed that gang activity can impair the safety and security of the institution, staff and inmates. Therefore, accommodating the plaintiff's right to send gang-related material to other inmates would adversely affect others in the institution. *See*

---

[4]*See* Wis. Admin. Code DOC § 309.10(4)(c)(10)(the department may not deliver incoming or outgoing mail if it teaches or advocates illegal activity, disruption or behavior consistent with a gang).

19

*Shaw*, 532 U.S. at 89.  As the Supreme Court has observed, "[w]here, as here, the right in question can be exercised only at the cost of significantly less safety for everyone else, guards and prisoners alike, the courts should defer to the informed discretion of corrections officials.  *Thornburgh*, 490 U.S. at 418 (internal quote marks and citation omitted).  Further, no easy alternative exists to searching the plaintiff's mail for gang-related material and he is free to send inmate to inmate mail so long as it does not contained prohibited material.  *See Shaw*, 532 U.S. at 89.  For all these reasons, the defendants' motion for summary judgment will be granted as to this claim.

## C. Claims 25 - Retaliation

In Claim 25, the plaintiff avers that defendant Lomen destroyed his magazines because the plaintiff threatened to file, and ultimately did file, a grievance complaining that Lomen wrongly determined that the publications were not appropriate for distribution.  Prisoners have a Fourteenth Amendment due process right to adequate, effective, and meaningful access to the court to challenge violations of their constitutional rights.  *Bounds v. Smith*, 430 U.S. 817, 821-22 (1977).  Prison officials cannot hinder prisoners from this access or retaliate against prisoners who attempt to exercise their constitutional rights.  *Williams v. Lane*, 851 F.2d 867, 878 (7th Cir. 1988).  Retaliation against a prisoner for his use of the courts or of the administrative complaint system may give rise to a valid cause of action under § 1983.  *See Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994).

To establish retaliation at the summary judgment stage, the plaintiff must

20

demonstrate: 1) a chronology of events from which retaliation could be inferred; and 2) that retaliation was a motivating factor behind the defendants' conduct. *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996); *Brookins v. Kolb*, 990 F.2d 308, 315 (7th Cir. 1993); *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987). Retaliatory motive may be inferred from the chronology of event. *Cain v. Lane*, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988); *Murphy v. Lane*, 833 F.2d 106, 108-09 (7th Cir. 1987). The retaliation inquiry should be undertaken "in light of the 'general tenor' of Sandin, which 'specifically expressed its disapproval of excessive judicial involvement in day-to-day prison management.'" *Babcock*, 102 F.3d at 275 (quoting *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995). Thus, courts should "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. *Id*.

It is undisputed that the plaintiff's magazines went missing on or about October 25, 2001. At that time, the plaintiff was not allowed to receive personal magazines because he was housed on Level 1 at WSPF. According to institutional policy, any magazine that came into the institution for the plaintiff should have been stored in the WSPF property room. However, if it was determined that a publication was not appropriate for distribution, prison officials would attach a property receipt to the publication and forward it to the property room. The WSPF property room did not receive a property receipt for the plaintiff's magazines and the plaintiff never received his 5 missing magazines.

The plaintiff alleges that his magazines were taken from the property room

21

after he informed defendant Lomen that he would be filing an inmate complaint. However, there is no evidence before the court showing that the plaintiff filed any grievance complaining about defendant Lomen, let alone any evidence that such complaint was filed before his magazines went missing. At summary judgment, a plaintiff is required to submit what evidence he has to prove his claims. *See Koszola v. Bd. of Ed.*, 385 F.3d 1104, 1111 (7th Cir. 2004)(at summary judgment, a party must submit what evidence it has). Because the record does not support the plaintiff's claim that he filed any inmate complaint, the court is not persuaded that he was retaliated against for exercising his constitutional right to access the courts. *See Williams,* 851 F.2d at 878.

The plaintiff further avers that he was retaliated against "for promising to file" a complaint that defendant Lomen wrongly determined that two of his magazines were inappropriate for delivery. However, the plaintiff's promise to file an inmate complaint does not qualify as protected speech. *See Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986)(inmates do not have a First Amendment right to make threats). Thus, the plaintiff has failed to meet his burden of demonstrating either a chronology of events from which retaliation could be inferred or that retaliation was a motivating factor behind the defendants' conduct. *See Babcock*, 102 F.3d at 276.

At most, the plaintiff has established that defendant Lomen was negligent in getting his magazines to their proper destination. However, **negligence is not enough to sustain a claim under 42 U.S.C. § 1983.** *Thomas v. Farley*, 31 F.3d 557, 558 (7th Cir.

22

1994); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996). Thus, the defendants are entitled to summary judgment on this claim.

**D. Claim 38 - Religious Feast**

The plaintiff alleges that for the 2001 Ramadan, defendants Overbo, Berge and John and Jane Does insulted the Ramadan participants by issuing an extra dessert as the feast meal. Additionally, the plaintiff asserts that these defendants retaliated against him by not giving him anything for the feast and repudiating it all together.

As a prisoner, the plaintiff retains those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the correctional system. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Encompassed within the First Amendment is the right of free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Richards v. White*, 957 F.2d 471, 474 (7th Cir. 1992); *Kaufman v. McCaughtry*, 419 F.3d 678 (7th Cir. 2005).

Inmates are entitled to practice their religion so long as doing so does not unduly burden the institution. *Richards v. White*, 957 F.2d at 474. A prison regulation that infringes upon an inmate's free exercise rights may be valid "if it is reasonably related to legitimate penological interests." *Alston v. DeBruyn*, 13 F.3d 1036, 1039 (7th Cir. 1994)(quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991)(prison officials need only make reasonable efforts to afford inmates an opportunity to practice their faith). In balancing the two interests, several factors

23

are relevant: (1) whether there is a legitimate governmental interest underlying the prison officials' actions; (2) whether the prisoner retains alternative ways of exercising the right in question; and (3) the impact accommodation of the asserted constitutional right would have on guards, other inmates, and on the allocation of prison resources. *Richards*, 957 F.2d at 471 (citing *Al-Alamin,* 926 F.2d at 685).

In 2001, the plaintiff participated in the Eid-ul-Fitr feast meal, which consisted of the regular institution meal and an extra desert. Under DOC Internal Management Procedure #6, religious feasts consist of regular institution meals or special religious diet meals prepared by the institution. No outside food is permitted into any DOC institution for religious feasts or other special events involving a meal for inmates.

The plaintiff contends that he was denied the Eid-ul-Fitr feast meal because it did not conform with the requirements of his religion and, therefore, violated his constitutional right to practice his religion. However, the plaintiff does not indicate what he should have been provided. Based on this, it is unclear whether serving the plaintiff a regular institution meal for a religious feast violated his free exercise rights. *See Alston,* 13 F.3d at 1039.

Assuming, however, that the contents of the Eid-ul-Fitr feast meal somehow violated his right to exercise his religion, the defendants have demonstrated that they have a legitimate penological interest in infringing on this right. *See Richards*, 957 F.2d at 471. First, it is undisputed that it is difficult to effectively search incoming food for contraband

24

such as weapons or drugs.  Second, it is difficult for institution staff to ascertain whether food was prepared in sanitary conditions and maintained at the appropriate temperatures. Therefore, the defendants' policy requiring institution meals to be served at religious feasts serves their legitimate penological interests in maintaining institutional security and protecting inmates from potential harm from improperly prepared food.  *See Al-Alamin*, 926 F.2d at 686 (the interest in maintaining institutional security is a legitimate penological concern); *see also Russell v. Richards*, 384 F.3d 444, 448 (7th Cir. 2004)(correctional institutions have an obligation to ensure the safety and medical well-being of its inmates).

Applying the remaining *Al-Alamin* factors, the court is satisfied that there is a rational connection between WSPF's policy and the interests put forward to justify it. There is a valid, rational connection between the defendants' interest in ensuring institutional security and the health of inmates, and the DOC's approach of providing institution-made meals that are consistent with the religious beliefs of that group.  The impact that accommodation of the right asserted by the plaintiff would have on guards and other inmates is unclear because the plaintiff has not indicated exactly what he expects to receive as a religious meal.  However, it is undisputed that there are easy and available alternative avenues for the plaintiff to practice his religious.  Specifically, regardless of whether religious feasts consist of a regular institution meal or special religious diet meals, inmates are allowed to celebrate their religious feast by gathering with other inmate adherents and sharing the meal together.  In addition, inmates may also exercise their religious beliefs and

25

practices in the following ways: (1) a special congregate service; (2) religious diet request; (3) individual study; (4) personal meditation; (5) utilization of religious books or property; (6) individual religious observance in their living quarters; (7) correspondence with fellow believers; (8) pastoral visits; (9) additional foods meeting religious dietary principles either through purchase at the institution canteen or through approved donations; and (10) requesting to abstain from work or programs.

In sum, the record demonstrates that the DOC's policy regarding religious feasts does not amount to unreasonable intrusion on the plaintiff's ability to practice his religious. See Alston, 13 F.3d at 1039 (a prison regulation that infringes on an inmate's free exercise rights is valid if it is reasonably related to legitimate penological interests). Therefore, the defendants' motion for summary judgment will be granted.

**IT IS THEREFORE ORDERED** that the defendants' second motion for summary judgment (Docket # 91) is **granted.**

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 5th day of February, 2008.

**SO ORDERED,**

s/ Rudolph T. Randa
**HON. RUDOLPH T. RANDA**
**Chief Judge**

26